IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| THE NORTHWEST PUBLIC COMMUNICATIONS COUNCIL, UNIDENTIFIED PSPs A to Z, and NPCC MEMBERS: CENTRAL TELEPHONE, INC.; COMMUNICATION MANAGEMENT SERVICES, LLC; DAVEL COMMUNICATIONS a/k/a PHONETEL TECHNOLOGIES, INC.; INTERWEST TELECOM SERVICES CORPORATION; NCS COMMUNICATIONS PUBLIC SERVICES CORPORATION; NATIONAL PAYPHONE SERVICES, LLC; PACIFIC NORTHWEST PAYPHONES; PARTNERS IN COMMUNICATION; T & C MANAGEMENT, LLC; CORBAN TECHNOLOGIES, INC.; and VALLEY PAY PHONES, INC., | 09-CV-1351-BR

OPINION AND ORDER |

        Plaintiffs,

v.

QWEST CORPORATION,
UNIDENTIFIED CORPORATIONS I-X,
and JOHN DOES 1-10,

        Defendants.

**FRANKLIN G. PATRICK**
P.O. Box 231119
Portland, OR 97281
(503) 245-2828

**RICHARD D. GAINES**
Richard D. Gaines & Associates, PC
102 Sugarberry Lane
Greentown, PA 18426
(570) 857-0180

        Attorneys for Plaintiffs

**LAWRENCE H. REICHMAN**
Perkins Coie, LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
(503) 727-2019

        Attorneys for Defendants

**BROWN, Judge.**

This matter comes before the Court on Defendant Qwest Corporation's Motion (#12) to Dismiss First Amended Complaint or to Stay. For the reasons that follow, the Court **GRANTS** Qwest's Motion and dismisses this matter.


## BACKGROUND

**I.   Regulatory Background.**

In 1996 Congress amended the Federal Communications Act of 1934 in part to improve competition in the telecommunications industry in the wake of the breakup of the former AT&T into Bell Operating Companies (BOCs). *See* 47 U.S.C. § 151, *et seq.* In

particular, Congress enacted §§ 201 and 276 of the Act to promote

greater competition among payphone service providers (PSPs) and

to prevent Local Exchange Carriers (LECs) that were often owners

of payphone lines and payphone service providers from discrimi-

nating against other PSPs in favor of their own payphone

services.  In *Davel Communications, Inc. v. Qwest Corporation*,

PSPs and LEC Qwest disputed certain payphone service tariffs

charged by Qwest.  460 F.3d 1075 (9th Cir. 2006).  In *Davel* the

Ninth Circuit set out the following regulatory background that

summarizes the numerous administrative orders issued by the

Federal Communications Commission (FCC) in its implementation of

the Act:

> Chapter 5 of the Federal Communications
> Act of 1934 as amended by the 1996 Act
> regulates the telecommunications industry.
> 47 U.S.C. § 151 *et seq*.  As a general matter,
> the Federal Communications Act requires
> common carriers subject to its provisions to
> charge only just and reasonable rates, *id.*
> § 201, and to file their rates for their
> services with the FCC or, in some cases, with
> state agencies.  *Id.* § 203. As part of the
> 1996 Act's general focus on improving the
> competitiveness of markets for telecom-
> munications services, § 276 substantially
> modified the regulatory regime governing the
> payphone industry by providing, in general
> terms, that dominant carriers may not
> subsidize their payphone services from their
> other telecommunications operations and may
> not "prefer or discriminate in favor of
> [their] payphone service[s]" in the rates
> they charge to competitors.  *Id.* § 276(a).
> The 1996 Act directs the FCC to issue
> regulations implementing these provisions,
> specifying in some detail the mandatory

contents of the regulations. *Id.* § 276(b).

Pursuant to this directive, the FCC adopted regulations requiring local exchange carriers such as Qwest to set payphone service rates and "unbundled features" rates, including rates for fraud protection, according to the FCC's "new services test" (sometimes "NST"). The new services test requires that rates for those telecommunications services to which it applies be based on the actual cost of providing the service, plus a reasonable amount of the service provider's overhead costs. The FCC's regulations required local exchange carriers to develop rates for the use of public access lines by intrastate payphone service providers that were compliant with the new services test. The rates were to be submitted to the utility commissions in the states in the local exchange carriers' territory, which would review and "file" (*i.e.*, approve) the rates. *See In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Report and Order, FCC 96-388, 11 F.C.C.R. 20,541 (Sept. 20, 1996); *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Order on Reconsideration*, FCC 96-439, 11 F.C.C.R. 21,233 (Nov. 8, 1996) ¶ 163 ("Order on Recons.")(collectively "Payphone Orders"). Also pursuant to the regulations, local exchange carriers were required to file their "unbundled features" rates with both the state commissions and the FCC for approval. *Order on Recons*. ¶ 163. The FCC required the local exchange carriers to file the new tariffs for both kinds of rates by January 15, 1997, with an effective date no later than April 15, 1997. *Id*.

In addition, the Payphone Orders required interexchange carriers, mainly long distance telephone service providers, to pay "dial-around compensation" to payphone

service providers, including Qwest, for calls
carried on the carrier's lines which
originated from one of the provider's pay
telephones.  If, however, the payphone
service provider was also an incumbent local
exchange carrier, as was Qwest, the Payphone
Orders required full compliance with the new
tariff filing requirements, including the
filing of cost-based public access line rates
and fraud protection rates, before the local
exchange carrier could begin collecting
dial-around compensation.

                    * * *

        On April 15, 1997, the FCC issued an
order granting a limited waiver of the new
services test rate-filing requirement.  *In
re Implementation of the Pay Telephone
Reclassification and Compensation Provisions
of the Telecommunications Act of 1996*, *Order*,
DA 97-805, 12 F.C.C.R. 21,370 (Apr. 15, 1997)
("Waiver Order").  Specifically, the Waiver
Order granted an extension until May 19,
1997, for filing intrastate payphone service
rates compliant with the new services test,
while at the same time permitting incumbent
local exchange carriers to begin collecting
dial-around compensation as of April 15,
1997.  *Id.* ¶ 2.  The Waiver Order stated that
the existing rates would continue in effect
from April 15, 1997, until the new, compliant
rates became effective ("the waiver period").
The NST-compliant rates were to be filed with
state utility commissions, which were
required to act on the filed rates "within a
reasonable time." *Id.* ¶ 19 n.60; *see also
id.* ¶¶ 2, 18-19, 25.  If a local exchange
carrier relied on the waiver, it was required
to reimburse its customers" from April 15,
1997 in situations where the newly [filed]
rates, when effective, are lower than the
existing [filed] rates." *Id.* ¶¶ 2, 20, 25.
The order emphasized that the waiver was
"limited" and "of brief duration." *Id.*
¶¶ 21, 23.

460 F.3d at 1081-83 (footnotes omitted).

## II.  Administrative History.

Plaintiff Northwest Public Communications Council (NPCC) is
a regional trade organization that represents companies providing
public payphone services.  Some of its members, including the
named Plaintiffs, purchase payphone services from Defendant Qwest
and are generally known as PSPs.  Qwest is a BOC as defined in 47
U.S.C. § 153 and a regulated LEC that owned nearly 80% of the
payphone lines in Oregon during the relevant period until it sold
its payphone services business in 2004.

On June 16, 2010, the Court requested the parties to file a
joint statement of the history of this matter.  On July 9, 2010,
the parties filed a Stipulation (#56) Regarding Procedural
History of the Case in which the parties provided the Court with
a summary of the relevant administrative background.  In
addition, the parties jointly submitted thirty-five documents to
support their factual summary.[1]  The Stipulation essentially
creates a time-line summarizing four categories of events related
to this matter:  (1) the numerous FCC orders that implement the
Telecommunications Act of 1996, including the "Waiver Order" and

---

[1] Under Federal Rule of Evidence 201, the Court may take
judicial notice of documents that are "capable of accurate and
ready determination by resort to sources whose accuracy cannot
reasonably be questioned."  The Court finds the documents
submitted by the parties as part of their Stipulation Regarding
the Procedural History of the Case are suitable for judicial
notice, and, therefore, the Court, in the exercise of its
discretion, takes judicial notice of those documents.

the "Wisconsin Order"; (2) the history of Qwest's payphone tariff
rates for Public Access Lines (PALs) and Fraud Protection
services (CustomNet) charged and filed with the Oregon Public
Utilities Commission (PUC); (3) the procedural history of NPCC's
claim filed with the PUC in May 2001 against Qwest for refunds of
tariffs paid to Qwest (Docket DR 26/UC 600)("Refund Case"); and
(4) the history of Qwest's general rate-setting case at the PUC
(Docket UT 125) ("Rate Case").  The Court incorporates by
reference the administrative history stipulated to by the parties
and summarizes the following relevant facts from the parties'
Stipulation for purposes of this Motion:

   **A.   Qwest's Oregon Payphone Tariff Rates.**

   In September 2001 the PUC concluded the Rate Case in which
it facilitated the design of and ultimately adopted certain Qwest
tariff rates for payphone services.  In March 2002 NPCC appealed
the PUC's final rate determination to the Marion County Circuit
Court and subsequently appealed that court's decision to the
Oregon Court of Appeals in October 2002.  While the appeal was
pending, Qwest filed acknowledgments with the PUC on February 14
and July 28, 2003, that reflected respectively Qwest's reduction
of PAL and CustomNet rates.  Qwest contended those reductions
were compliant with the FCC orders that the rates were to be set
in accordance with the "New Services Test" (NST).  The PUC
accepted Qwest's rate filings and made the rates effective for

PAL on March 17, 2003, and for CustomNet on August 28, 2003.

In November 2004 the Oregon Court of Appeals issued its decision in *Northwest Public Communications Council v. Public Utilities Commission of Oregon* in which it reversed the Marion County Circuit Court, remanded the PUC's initial rate-setting decision, and required the PUC to reconsider the payphone services rates in light of the recent FCC orders, including the Wisconsin Order that clarified the method for applying the NST. 196 Or. App. 94 (2004).

On October 15, 2007, during the process of resolving the order of remand from the Oregon Court of Appeals, Qwest and NPCC stipulated that the PAL and CustomNet rates submitted by Qwest and approved by the PUC in 2003 were NST-compliant. On November 15, 2007, the PUC adopted that stipulation and confirmed Qwest's compliance with the NST for PAL and CustomNet rates.

**B.     The Refund Case.**

In May 2001 NPCC filed a complaint with the PUC seeking refunds of PAL rates that NPCC allegedly paid in excess of the NST-compliant rates. In 2004 and 2005 the parties filed cross-motions for summary judgment with the PUC on the issue of Qwest's refund liability for PAL rates. In March 2005 an ALJ held the case in abeyance rather than ruling on the merits with the hope that the FCC would issue additional guidance as to the Waiver Order's application. Because that guidance was ultimately

not forthcoming, NPCC moved to lift the abeyance, the PUC granted that motion, and the PUC reinstated the case on February 5, 2009. NPCC then moved to amend its complaint to add its CustomNet rate claims to its claims for PAL refunds. In May 2009 the PUC denied NPCC's motion to add the CustomNet claims partly on the ground that they were barred by the statute of limitations.

According to the parties' representations, NPCC and Qwest's pending motions for summary judgment as to NPCC's refund claim for PAL rates allegedly not NST-compliant are pending before the PUC and are on track to be resolved soon.

## PROCEDURAL BACKGROUND IN THIS COURT

This matter comes before the Court after more than 12 years of administrative and legal proceedings between Qwest and NPCC at the state level. On November 13, 2009, Plaintiff NPCC and many of its constituent members filed a Complaint in this Court. On January 12, 2010, Plaintiffs filed a First Amended Complaint asserting 18 claims against Defendants Qwest Corporation, Unidentified Corporations I-X, and John Does 1-10. Plaintiffs seek (1) a declaratory judgment as to the rights between the parties concerning certain payphone services rates that Defendants allegedly charged Plaintiffs and are required by law to refund to Plaintiffs and a declaratory judgment as to the nature of the federal and state laws governing this dispute;

(2) a declaration and award of damages against Defendants for
violation of 47 U.S.C. § 276 by failing to file legal tariffs and
for employing discriminatory tariffs; (3) an award of damages
against Defendants together with attorneys' fees and costs for
violation of 47 U.S.C. § 201 by failing to abide by "just and
reasonable practices"; (4) an award of damages against Defendants
together with attorneys' fees and costs for violation of 47
U.S.C. § 407 by failing to pay refunds to Plaintiffs in
compliance with FCC orders; (5) an award of damages against
Defendants together with attorneys' fees and costs for violation
of 47 U.S.C. § 416 by failing to file legal tariffs and for
noncompliance with FCC orders; (6) an award of a refund of
Plaintiffs' tariffs paid to Defendants in excess of the required
rates together with attorneys' fees and costs for common-law
unjust enrichment; (7) an award of damages against Defendants
equal to the refunds not paid by Defendants to Plaintiffs as
third-party beneficiaries for breach of contract between
Defendants and the FCC; (8) an award of damages against
Defendants together with attorneys' fees and costs for conversion
of refunds to which Plaintiffs are entitled; (9) a judgment
against Defendants together with attorneys' fees and costs
estopping Defendants from denying their obligation to pay a
refund to Plaintiffs based on statements to the FCC and the
American Public Communications Council; (10) an award of damages

and punitive damages against Defendants together with attorneys'
fees and costs for intentional fraud in making knowing false
representations; (11) an award of damages and punitive damages
against Defendants together with attorneys' fees and costs for
negligent fraud in making false representations; (12) an award of
damages and punitive damages against Defendants together with
attorneys' fees and costs for violations of the Oregon Deceptive
Trade Practices Act, Oregon Revised Statutes §§ 646.605, *et seq.*;
(13) an award of damages and punitive damages against Defendants
together with attorneys' fees and costs for violation of Oregon
Revised Statute § 759.185 by failing to comply with mandatory
refunds; (14) an award of damages and punitive damages against
Defendants together with attorneys' fees and costs for violation
of Oregon Revised Statute § 759.275 by affording Plaintiffs'
competitors undue preferences; (15) an award of damages and
punitive damages against Defendants together with attorneys' fees
and costs for violation of Oregon Revised Statute § 759.455 by
denying Plaintiffs access to services while providing access to
Plaintiffs' competitors; (16) an award of damages and punitive
damages against Defendants together with attorneys' fees and
costs for lost business opportunities due to Defendants'
intentional interference with Plaintiffs' business relationships
and contracts; (17) an award of damages against Defendants
together with attorneys' fees and costs for breach of oral and

written promises made by Qwest to Plaintiffs for refunds of noncompliant tariffs; and (18) the imposition of a constructive trust in favor of Plaintiffs for Qwest's breach of fiduciary duty by failing to refund tariffs overpaid by Plaintiffs.

On March 4, 2010, Qwest filed its Motion to Dismiss First Amended Complaint or to Stay seeking to dismiss each of Plaintiffs' claims.

On June 16, 2010, the Court heard oral argument on Qwest's Motion. At the hearing, the Court determined it would first assess Qwest's Motion to Dismiss with respect to Plaintiff's federal claims and would then address Plaintiffs' remaining state-law claims if necessary. In addition to its request for a stipulated administrative history as noted, the Court also allowed the parties to file supplemental briefs limited to the parties' arguments with respect to Plaintiffs' federal claims.

On July 22, 2010, the Court heard additional oral argument with respect to Qwest's Motion to Dismiss Plaintiffs' federal claims and took this matter under advisement.


**STANDARDS**

> To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic v. Twombly*, 550 U.S. 554,] 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

> the reasonable inference that the defendant
> is liable for the misconduct alleged. *Id.* at
> 556 . . . . The plausibility standard is not
> akin to a "probability requirement," but it
> asks for more than a sheer possibility that a
> defendant has acted unlawfully. *Ibid*. Where
> a complaint pleads facts that are "merely
> consistent with" a defendant's liability, it
> "stops short of the line between possibility
> and plausibility of 'entitlement to relief.'"
> *Id*. at 557, 127 S. Ct. 1955 (brackets
> omitted).

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). *See also Bell Atlantic v. Twombly*, 550 U.S. 554, 555-56 (2007). The court must accept as true the allegations in the complaint and construe them in favor of the plaintiff. *Intri-Plex Tech., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1050 n.2 (9th Cir. 2007). "The court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court." *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000)(citations omitted).

The court's reliance on judicially-noticed documents does not convert a motion to dismiss into a summary-judgment motion. *Intri-Plex*, 499 F.3d at 1052.

## DISCUSSION

Qwest moves to dismiss each of Plaintiffs' claims and specifically moves to dismiss Plaintiffs' federal Claims One-Five on the following grounds: (1) Each of Plaintiffs' claims are

barred by the applicable statute of limitations; (2) Plaintiffs
failed to state a claim with respect to Claim Four under 47
U.S.C. § 407; (3) the Court should abstain from ruling on
Plaintiff's federal-law claims on the basis of the *Colorado River*
abstention doctrine (*Colorado River Water Conservation Dist. v.*
*United States*, 424 U.S. 800 (1976)); (4) if the Court does not
abstain, the Court should decline to issue a declaratory ruling
advising the PUC on issues within the agency's expertise; and
(5) the Court should defer to the PUC because the PUC has primary
jurisdiction to resolve this matter.

## I.    Statute of Limitations.

Qwest contends Plaintiffs' Claims One-Five brought pursuant
to 47 U.S.C. §§ 201, 276, 407, and 416 for refunds of PAL and
CustomNet charges that Plaintiffs allegedly paid in excess of the
NST-compliant rates are barred by the applicable statute of
limitations.  Plaintiffs, however, contend their claims are
timely and, in any event, assert the Court should toll the
statute of limitations on equitable grounds.

### A.    The Law.

Qwest contends, and Plaintiffs do not dispute, that
Plaintiffs' Claims One-Three brought pursuant to §§ 201 and 276
are governed by a two-year statute of limitations (*see* 47 U.S.C.
§ 415(b)) and Plaintiffs' Claim Four in which Plaintiffs seek to
enforce FCC orders pursuant to §§ 407 is governed by a one-year

statute of limitations.  *See* 47 U.S.C. § 415(f).  In addition,

Plaintiffs request damages in Claim Five, but they also seek to

enforce FCC orders that direct Defendants to "pay the required

refunds to plaintiffs as required by 47 U.S.C. § 416(c) and the

related applicable orders of the FCC."  The parties, however, did

not explicitly address the applicable limitations period for a

claim under § 416.[2]  Thus, it is unclear whether Plaintiffs'

Claim Five is a claim for damages governed by the two-year

statute of limitations in § 415(b) or a claim to enforce an FCC

order to pay money governed by the one-year statute of

limitations under § 415(f).  Based on the language of § 416(c)

and Plaintiffs' Claim Five as pled, it appears Plaintiffs seek to

enforce an FCC order to pay money in Claim Five, which would be

subject to the one-year statute of limitations § 415(f).

    The limitations periods in §§ 415(b) and (f) begin to run on

claims made thereunder "from the time the cause of action

accrues."  Plaintiffs filed their Complaint in this Court on

November 13, 2009, so the question for the Court is whether

Plaintiffs' Claims One-Three accrued before November 13, 2007,

and whether Plaintiff's Claims Four and Five accrued before

---

[2] Section 416(c) provides:

> It shall be the duty of every person, its agents and
> employees, and any receiver or trustee thereof, to observe
> and comply with [FCC] orders so long as the same shall
> remain in effect.

November 13, 2008.  For purposes of federal law, a claim accrues
when a would-be plaintiff has sufficient notice of an injury to
put him on "inquiry notice" of a potential claim.  *Davel*, 460
F.3d at 1091-92.  In *Davel* the Ninth Circuit held:  "Accrual does
not wait until the injured party has access to or constructive
knowledge of all the facts required to support its claim.  Nor is
accrual deferred until the injured party has enough information
to calculate its damages."  *Id.* (quoting *Sprint Commc'n Co. v.*
*FCC*, 76 F.3d 1221, 1228 (D.C. Cir. 1996)(citing *United States v.*
*Kubrick*, 444 U.S. 111, 123 (1979)).  After "a Plaintiff has
[inquiry] notice [of its claim], it bears the responsibility of
making diligent inquiries to uncover the remaining facts needed
to support the claim."  *Davel*, 460 F.3d at 1092 (quoting *Sprint*
*Commc'n Co. v. FCC*, 76 F.3d 1221, 1228 (D.C. Cir. 1996)).

**B.  Analysis.**

As noted, in their Claims One-Three, Plaintiffs seek
declaratory, equitable, and legal relief under §§ 201 and 276 for
Defendants' alleged failure to file NST-compliant PAL and
CustomNet rates and for charging discriminatory and unreasonable
rates.  In their Claims Four and Five, Plaintiffs seek to enforce
orders issued by the FCC that require Defendants to refund
Plaintiffs for PAL and CustomNet rates charged to Plaintiffs that
were not NST-compliant.

**1.  Claims One-Three Regarding PAL Rates.**

16 - OPINION AND ORDER

On the basis of the Stipulation the parties filed in
this matter, Qwest contends Plaintiffs knew Qwest allegedly
charged PAL rates that were not NST-compliant.  Thus, Qwest
contends Plaintiffs' federal-law claims have accrued and the
statute-of-limitations period has expired on Plaintiffs' claims
for PAL refunds.  In turn, Plaintiffs contend their claims
related to PAL rates are timely because they could not determine
whether Qwest's PAL rates, in fact, were NST-compliant until the
PUC approved the final PAL rates nor could Plaintiffs calculate
their damages (*i.e.*, the amount of the refund allegedly due is
the difference between the rates Qwest actually charged and the
NST-compliant rates).  Although the parties executed a
stipulation on October 15, 2007, that Qwest's PAL rates set
in 2003 were NST-compliant, Plaintiffs contend their claims
did not accrue until the PUC's adoption of that stipulation on
November 15, 2007.  Thus, because Plaintiffs filed their
Complaint in this Court on November 13, 2009, they contend their
claims are timely and are not barred by the two-year statute of
limitations.

To support its position, Qwest points to the Ninth
Circuit's holding in *Davel* with respect to the accrual of a claim
under § 415 in which the court directly rejected arguments
similar to those advanced by Plaintiffs:

We reject Davel's contention that its
cause of action did not accrue until Qwest

filed NST-compliant rates in 2003, because
it had no knowledge until then that Qwest's
rates were too high.  The D.C. Circuit,
affirming the FCC, rejected such a contention
in similar circumstances in *Sprint
Communications Co. v. FCC*, 76 F.3d 1221,
1227-31 (D.C. Cir. 1996)(rejecting
application of a "discovery" rule of accrual
where cause of action was predicated on
"AT&T's failure to file and to charge
cost-justified rates").  In that case, the
plaintiff, Sprint, argued that it had no
knowledge of its claim based on the payment
of tariffed rates for telecommunications
services until the defendant, AT&T, several
years later, filed cost data indicating that
the rates charged exceeded lawful levels. *Id*.
at 1224-25.  Affirming the FCC, the D.C.
Circuit held that Sprint was on inquiry
notice of the claim as soon as it had
knowledge suggesting the rates might be
improper.  *Id*. at 1229-30.

* * *

The fact that, until Qwest filed its new
fraud protection rates in 2003, Davel was not
in a position to determine the precise amount
of the overcharges, or even whether the
charges were excessive at all, does not
change this result.

460 F.3d at 1091-92.  Accordingly, to resolve the dispute over

when Plaintiffs' claims accrued, the Court must determine at what

point Plaintiffs had "knowledge suggesting the rates might be

improper."

In its memoranda and at oral argument, Qwest contends

the stipulated record and publicly available documents put

Plaintiffs on "inquiry notice" of their potential claim for PAL

refunds; specifically, Plaintiffs had inquiry notice (1) when

Qwest failed to file NST-compliant rates in accordance with the FCC's Waiver Order in May 2007; (2) when NPCC filed its complaint with the PUC in May 2001 seeking refunds of PAL rates that NPCC alleged were not NST-compliant;[3] (3) when Qwest reduced its PAL rates in 2003 and asserted its adjusted rates were NST-compliant; (4) when the Oregon Court of Appeals remanded in 2004 the initial rates set by the PUC in the Rate Case for failure to consider recent FCC orders clarifying the method for applying the NST; and (5) when NPCC stipulated on October 15, 2007, that Qwest's rates (filed with and approved by the PUC in 2003) were NST-compliant.

Nevertheless, Plaintiffs assert they could not determine whether Qwest's PAL rates were NST-compliant or determine Plaintiffs' damages because Qwest had not released the data required to calculate the legal tariff rates and the PUC had not determined whether Qwest's rates were NST-compliant. As noted, the *Davel* and *Sprint* courts expressly rejected similar arguments. In any event, the record here belies Plaintiffs' assertion that they lacked sufficient knowledge to form a basis for their claims until November 15, 2007. In its 2001 complaint filed with the PUC (stipulated document number 20), NPCC alleged

---

[3] Even though Plaintiffs now inexplicably assert the PUC does not have jurisdiction over this matter, the Court notes NPCC stated in its complaint filed with the PUC in May 2001 that "[t]he OPUC has jurisdiction over this Complaint under ORS 756.500,756.040, 756-160 through 756.200, OAR 860-013-0015, and FCC Orders in Docket Nos. CC 96-128 and CC 91-35."

"there is substantial evidence that Qwest's PAL rates have
exceeded the permissible rates under the New Services Test."
NPCC's complaint makes clear NPCC knew Qwest had to properly
account for its costs and overhead in a manner consistent with
the NST and that NPCC had "powerful evidence" that proved Qwest
had not done so.  The Oregon Court of Appeals decision in
*Northwest Public Communications Council v. Public Utilities
Commission of Oregon* also makes clear that NPCC made similar
arguments at the Oregon circuit-court and appellate-court levels
in 2003 and 2004.  196 Or. App. at 96-100.  *See also* 196 Or. App.
at 100-08 (Wollheim J., concurring).  In addition, Qwest made
reductions in its PAL rates in 2003 in order to be compliant with
FCC orders (stipulated documents numbers 13-16).  Moreover, in
its order placing the NPCC claims in abeyance on March 23, 2005
(stipulated document number 23), the PUC notes NPCC stated in a
document filed on January 18, 2005, that NPCC had calculated its
damages in Oregon to be in excess of six million dollars, which
demonstrates NPCC had some basis to assert it was injured by PAL
rates that were not NST-compliant and could determine their
damages to some extent.  Ultimately NPCC stipulated on October
15, 2007, that those rates set by the PUC in 2003 were NST-
compliant.[4]  Despite Plaintiffs' repeated claim in its brief that

---

[4] Plaintiffs contend the terms of the stipulation before the
PUC are not binding on them in this Court.  The Court, however,
does not rely on the stipulation as determinative of the

it would be impossible to determine whether Qwest's PAL rates
were NST-compliant without a ruling from the PUC to that effect,
NPCC apparently did just that when it entered into the
stipulation with Qwest.

Any of these facts alone could suffice to show NPCC's
knowledge that "the rates might be improper," but *in toto* they
constitute overwhelming evidence of NPCC's knowledge of its claim
as of May 2001 and at the latest on October 15, 2007. In any
event, as noted, "[a]ccrual does not wait until the injured party
has access to or constructive knowledge of all the facts required
to support its claim. Nor is accrual deferred until the injured
party has enough information to calculate its damages." *Davel*,
460 F.3d at 1091-92. With the knowledge that Plaintiffs had,
Plaintiffs bore the burden to investigate their claims, to file
their claims in a court with jurisdiction, and to seek the
necessary information from Qwest to permit Plaintiffs to
determine the nature and extent of their injury. *See id.*
Although Plaintiffs did so, they chose state fora (the PUC and
Oregon courts) and elected not to file their claims in federal
court.

At oral argument on July 22, 2010, Plaintiffs attempted

---

substance of Plaintiffs' claims but merely to demonstrate
Plaintiffs' knowledge as of October 15, 2007, that the PAL and
CustomNet rates they paid to Qwest before it reduced them in 2003
were not NST-compliant and that Plaintiffs had a refund claim.

to distinguish *Davel* based on the fact that the Ninth Circuit did not consider the issue of the statute of limitations with respect to PAL rates.  Although Plaintiffs are correct that the statute of limitations for the plaintiffs' PAL claims in *Davel* was not at issue, that fact does not change the Ninth Circuit's general restatement of the nature of accrual of a claim or its analysis of § 415(b) and does not affect this Court's application of those rules to its assessment of the timing of Plaintiffs' knowledge of their claims.

On this stipulated record, therefore, the Court concludes Plaintiffs were on inquiry notice of their claims for refunds associated with PAL rates charged by Qwest before November 13, 2007.  Accordingly, Plaintiffs' Claims One-Three for relief associated with PAL rates charged by Qwest are barred by the two-year statute of limitations under 47 U.S.C. § 415(b).

## 2.  Claims One-Three regarding CustomNet Rates.

To support its contention that Plaintiffs' claims related to CustomNet rates are time-barred, Qwest asserts similar bases to those asserted against Plaintiffs' PAL-related claims.  Again, Qwest asserts Plaintiffs had sufficient knowledge of their claims related to CustomNet rates for Plaintiffs' claims to accrue.  Specifically, Qwest contends Plaintiffs had knowledge of their CustomNet claims (1) when Qwest failed to file NST-

compliant rates in accordance with the FCC's Waiver Order in May
2007; (2) when Qwest reduced its CustomNet rates in 2003 and
asserted its rates were NST-compliant; (3) when the Oregon Court
of Appeals remanded in 2004 the initial rates set by the PUC in
the Rate Case for failure to consider recent FCC orders
clarifying the NST; and (4) when NPCC stipulated on October 15,
2007, that Qwest's CustomNet rates (filed with and approved by
the PUC in 2003) were NST-compliant.

Plaintiffs rely on *Davel* to support their argument that
a rolling two-year statute of limitations applies in this matter,
which makes actionable any tariff payments that Plaintiffs made
to Qwest that were not based on NST-compliant rates. *See Davel*,
460 F.3d at 1093 ("[A]mounts paid under non-compliant tariffs
within two years prior to the filing of the complaint are
timely."). In October 2007 the parties stipulated that Qwest
filed NST-compliant rates in 2003. On this record, Plaintiffs
have not shown they paid any PAL or CustomNet rates since 2003
that were not NST-compliant. In fact, it appears Plaintiffs paid
NST-compliant rates for six years before filing this action.
Thus, without deciding whether a rolling statute of limitations
actually applies here, Plaintiffs' claims associated with
CustomNet rates would be time-barred under the circumstances even
if a rolling statute of limitations applied.

Plaintiffs attempt to distinguish *Davel* based on the

fact that Qwest had not filed CustomNet rates with the FCC at the time the Ninth Circuit considered the matter. The Ninth Circuit concluded in *Davel* that the plaintiffs' claim accrued when Qwest missed the deadline in 1997 to timely file CustomNet rates in accord with the FCC. *Id*. at 1091-92. In *Davel*, however, it appears Qwest filed its CustomNet rates with the state commissions, and here Qwest filed its CustomNet rates with the PUC as well. *Id. See also Northwest Public Comm. Council*, 196 Or. App. at 96-97. Thus, it appears *Davel* is not distinguishable on this ground. To the extent there is a factual distinction, it is a distinction without a difference because Qwest's failure to file with the FCC did not bear on the Ninth Circuit's discussion of what constitutes accrual for purposes of a statute-of-limitations analysis; *i.e.*, accrual concerns a potential plaintiff's knowledge of the existence of a claim rather than knowledge of all of its particulars. Thus, NPCC "was on inquiry notice of the claim as soon as it had knowledge suggesting the rates might be improper." *See id.* at 1092. As noted, on this record Plaintiffs had knowledge of Qwest's failure to comply with FCC orders, and, therefore, Plaintiffs were on inquiry notice before November 13, 2007.

Ultimately the Court's analysis with respect to PAL rates applies with equal force to Plaintiffs' CustomNet claims. Accordingly, the Court concludes Plaintiffs' Claims One-Three

associated with CustomNet rates charged by Qwest are barred by
the two-year statute of limitations under 47 U.S.C. § 415(b).

### 3. Claims Four and Five Regarding Enforcement of FCC Orders.

Qwest also contends Plaintiffs' Claims Four and Five to
enforce FCC orders under §§ 407 and 416 are time-barred by the
one-year statute of limitations under § 415(f).  In its First
Amended Complaint, Plaintiffs seek enforcement of FCC orders
requiring LECs to refund the difference between the rates it
charged PSPs and the NST-compliant rates.  Plaintiffs do not
appear to seek to enforce any order issued after November 13,
2006, and Plaintiffs did not identify any such order at oral
argument.  In any event, the record does not reflect there was an
FCC order issued after 2002 that required LECs to refund rates
charged in excess of the NST-compliant rates, and it appears the
only order requiring Defendants to do so is the Waiver Order
issued by the FCC on April 15, 1997.

Accordingly, the Court concludes Plaintiffs' Claims
Four and Five to enforce FCC orders pursuant to §§ 407 and 416
are barred by the one-year statute of limitations under 47 U.S.C.
§ 415(f).  To the extent either Claim Four or Five could be
construed as claims for damages governed by the two-year statute
of limitations under § 415(b), the Court's analysis of the
statute's application to Plaintiff's Claims One-Three would apply
with equal force to Claim Four or Five, and those claims would

still be time-barred.

### 4. Equitable Tolling.

Even if the statute of limitations bars their claims,
Plaintiffs maintain the Court should exercise its discretion to
equitably toll the limitations period. Plaintiffs point to their
vigorous litigation of this issue from 1997 to the present and
contend the statute should be tolled during the period that they
were opposing both Qwest's proposed rates and the PUC's
formulation of the NST-compliant rates.

In *Huseman v. Icicle Seafoods, Inc.*, the Ninth Circuit
stated:

> Equitable tolling "focuses on whether there
> was excusable delay by the plaintiff" and
> "may be applied if, despite all due
> diligence, a plaintiff is unable to obtain
> vital information bearing on the existence of
> his claim." *Santa Maria*, 202 F.3d at 1178
> (emphasis added); *see also Burnett v. New
> York Cent. R. Co.*, 380 U.S. 424, 429, 85 S.
> Ct. 1050, 13 L. Ed. 2d 941 (1965)(allowing
> equitable tolling if "a plaintiff has not
> slept on his rights, but rather, has been
> prevented from asserting them").

471 F.3d 1116, 1120 (9th Cir. 2006). Qwest, however, maintains
even when a party can establish grounds for equitable tolling,
the tolling ceases after a party has legal representation as set
out by the Ninth Circuit in *Johnson v. Henderson*:

> The doctrine of equitable tolling "has been
> consistently applied to excuse a claimant's
> failure to comply with the time limitations
> where she had neither actual nor constructive

notice of the filing period." *Leorna*, 105
F.3d at 551. It focuses on whether there was
excusable delay by the plaintiff: "If a
reasonable plaintiff would not have known of
the existence of a possible claim within the
limitations period, then equitable tolling
will serve to extend the statute of
limitations for filing suit until the
plaintiff can gather what information he
needs." *Santa Maria*, 202 F.3d at 1178
(citations omitted); *see also Boyd v. United
States Postal Serv.*, 752 F.2d 410, 414 (9th
Cir. 1985)("The time period for filing a
complaint of discrimination begins to run
when the facts that would support a charge of
discrimination would have been apparent to a
similarly situated person with a reasonably
prudent regard for his rights.")(citation
omitted). However, "once a claimant retains
counsel, tolling ceases because she has
gained the means of knowledge of her rights
and can be charged with constructive
knowledge of the law's requirements."
*Leorna*, 105 F.3d at 551 (citing *Stallcop v.
Kaiser Found. Hosps.*, 820 F.2d 1044, 1050
(9th Cir.), *cert. denied*, 484 U.S. 986, 108
S. Ct. 504, 98 L. Ed. 2d 502 (1987))(internal
quotation marks omitted).

314 F.3d 409, 414 (9th Cir. 2002).

At oral argument, Plaintiffs' counsel did not offer any

basis for disregarding Qwest's argument as to the cessation of

equitable tolling when a party has legal representation, and

Plaintiffs conceded they were represented by counsel at least as

of May 2001 when NPCC filed its complaint with the PUC.

Plaintiffs, therefore, have been represented by counsel since at

least 2001 and "can be charged with constructive knowledge of the

law's requirements." *Id.* Thus, the Court finds NPCC had

knowledge that the Federal Communications Act provided Plaintiffs

with the option to invoke the jurisdiction of the federal
district court to hear claims for damages for violations "under
the provisions of this chapter." 47 U.S.C. § 207. Accordingly,
the Court declines to exercise its discretion to toll the statute
of limitations on this ground.

Because the Court has concluded each of Plaintiffs' federal-
law claims are barred by the applicable statute of limitations,
the Court need not address the remaining grounds advanced by
Qwest for dismissal of Plaintiffs' federal-law claims.

## II. Plaintiffs' State-Law Claims 6-18.

In addition, the Court concludes it does not have
jurisdiction over Plaintiffs' state-law Claims 6-18. In their
First Amended Complaint, Plaintiffs assert this Court has federal
jurisdiction pursuant to 28 U.S.C. § 1337 under which the
district Courts have "original jurisdiction of any civil action
or proceeding arising under any Act of Congress regulating
commerce or protecting trade and commerce against restraints and
monopolies." Plaintiffs' federal Claims One-Five arise under the
Federal Communications Act, which regulates commerce and protects
it against monopolies, and, on that basis, Plaintiffs assert the
Court has supplemental jurisdiction over their state-law Claims
6-18 pursuant to 28 U.S.C. § 1367. The Court, however, has
already dismissed Plaintiffs' federal Claims One-Five. In
accordance with § 1367(c), the "district courts may decline to

exercise supplemental jurisdiction over a [state-law claim] if
. . . the district court has dismissed all claims over which it
has original jurisdiction."

At both oral arguments, the Court raised the issue of
supplemental jurisdiction in the absence of Plaintiffs' federal
claims, and Defendant asserted in its Supplemental Memorandum
(#55) that if Plaintiffs' federal claims were dismissed, the
Court would no longer have jurisdiction over Plaintiffs' state-
law Claims 6-18.  At oral argument on June 16, 2010, Plaintiffs'
counsel acknowledged the Court would not have authority to act on
Plaintiffs' state-law claims in the absence of the federal-law
claims.

Accordingly, the Court declines to exercise jurisdiction
over Plaintiffs' state-law Claims 6-18 and, therefore, dismisses
this action in its entirety.


## CONCLUSION

For these reasons, the Court **GRANTS** Defendant Qwest's Motion
(#12) to Dismiss and **DISMISSES** this matter in its entirety.

IT IS SO ORDERED.

DATED this 25th day of October, 2010.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge